## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Stephen P. Barrett,                                      Civil No. 10-3298 (SRN/JJG)

               Plaintiff,

      v.                                              **MEMORANDUM OPINION**
                                  **AND ORDER**

Sedgwick CMS Long-Term Disability
Plan, and Aetna Life Insurance
Company,

               Defendants.

---

Jodell M. Galman, Galman Law Offices, 5200 Park Avenue, White Bear Township, Minnesota 55110, for Plaintiff.

Doreen A. Mohs, Mohs Law, 1960 Cliff Lake Road, Suite 129-425, Eagan, Minnesota 55122, for Defendants.

---

SUSAN RICHARD NELSON, United States District Judge

    This matter is before the Court on Defendants' Motion for Summary Judgment [Doc. No. 14] and on Plaintiff's cross-Motion for Summary Judgment [Doc. No. 21]. For the reasons stated below, this Court grants Plaintiff's Motion and denies Defendants' Motion.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

    This case presents the unusual situation in which the Court stands in the shoes of a benefits administrator to determine whether Plaintiff Stephen B. Barrett is entitled to long-term disability benefits. Defendant Aetna Life Insurance Company initially granted him such benefits, but in September 2006 determined that Barrett was no longer disabled

and discontinued benefit payments.[1]  The parties have stipulated that this Court's review of Aetna's decision is de novo.

In 1996, while he was working as a benefits specialist for short-term and long-term disability claims for Fortis Benefits, Barrett suffered a back injury playing basketball. His physicians treated the injury conservatively for several years, recommending occasional epidural injections and physical therapy, in addition to pain medication. During this time, he was frequently limited to working part-time.  In March 1999, Barrett began working for Sedgwick Claims Management Systems as a long-term disability benefits coordinator.  The record does not reflect whether he worked full- or part-time for Sedgwick.

In any event, Barrett's back condition worsened through the summer of 1999, and he went on disability leave at the end of August.  He ultimately had a spinal fusion and pin placement on October 27, 1999.  Prior to the surgery, the surgeon estimated that Barrett would be able to return to work within three months after surgery.  (Admin. R. at AE2206-07 (undated Attending Physician Statement from Dr. Jos Cove, orthopaedic surgeon).)[2]  In January 2000, however, Barrett was involved in a car accident, which delayed his progress.  An independent medical exam revealed that the accident "disrupted the L5-S1 fusion mass."  (AE2270 (letter from Dr. Robert Wengler to Van Holston, Esq.)

---

[1]  The parties agree that only Aetna has any liability in this matter, and that the Sedgwick CMS Long-Term Disability Plan is not a proper Defendant.

[2]  The Administrative Record is paginated sequentially, with each page number prefaced by "AE."  The Court will hereafter cite only the page number of the record when discussing documents in the record.

(Apr. 5, 2001).)   Barrett never returned to work.

Barrett initially received short-term disability salary continuation benefits from the parent company of Sedgwick, Marsh & McClennan Companies. (Stip. ¶ 4 (Doc. No. 13).) In late 1999, Marsh spun off its subsidiary Sedgwick, and Sedgwick ultimately created a long-term disability plan for the few employees who became disabled between July 31, 1999, and December 31, 1999.  (Id. ¶¶ 5, 10.)  This plan was administered by Defendant Aetna Life Insurance Company.  (Id. ¶ 14.)  Because neither party can locate the plan documents, which ostensibly give Aetna the discretion to determine eligibility for benefits, the parties have stipulated that the Court's review of the claims determination at issue must be de novo.  (Id. ¶ 18.)

Before Aetna assumed claims administration duties for the plan, Sedgwick approved Barrett's initial application for long-term disability benefits in March 2000. Under the plan's terms, Barrett was entitled to 30 months of long-term disability benefits if he could establish that he could not perform the duties of his "present occupation." (AE2446.)  After the first 30 months, to continue to qualify for benefits, Barrett had to establish that he was "continuously unable to engage in duties of any substantial gainful employment . . . ."  (Id.)[3]  In February 2002, using this stricter definition of "disability," Aetna approved the payment of long-term disability benefits to Barrett.  (AR at AE2220.)

---

[3] There are two definitions of the phrase "totally disabled" in the administrative record.  A "summary plan description" effective Jan. 1, 2000, states the definition of total disability as "[y]ou are not able, solely because of injury or disease, to work at any reasonable occupation."  (AR at AE2420.)  The two definitions are substantially similar, however, and using this second definition would not change the Court's analysis.

Aetna told Barrett that it would require proof of ongoing disability from time to time. (Id.)  In 2005, Aetna requested that Barrett provide it with statements from his physicians regarding his disability, and that Barrett sign medical release forms that would allow Aetna to obtain his medical records.  Barrett was slow in providing the requested information to Aetna, which apparently raised Aetna's suspicions.  For his part, Barrett notes that he had surgery in the fall of 2005 to remove a pain pump implanted in his spine that had malfunctioned, and that he had further surgery in March 2006 to remove screws from his first fusion that were impinging on the nerves of his spine.  He attributes his failure to promptly respond to Aetna's requests to his deteriorating condition.

In May 2006, Aetna hired an investigator to interview Barrett and to surreptiously videotape Barrett's activities.  A portion of the surveillance shows Barrett coaching his 9-year-old daughter's soccer practice.  During the interview, however, Barrett told the investigator that he could not do any volunteer work or participate in any kind of sports activity because of his back pain.  (AE2328.)  Aetna interpreted Barrett's abilities on the tape as evidence that he was not disabled, and in September 2006 it notified Barrett that it was terminating his long-term disability coverage.

Barrett took several appeals from this decision.  Aetna reaffirmed its decision in all respects, and issued its final denial of long-term disability benefits in August 2010. (AE2974.)  This lawsuit followed.

## II.     DISCUSSION

## A.     Standard of Review

De novo review "entails consideration of an issue as if it had not been decided previously." United States v. George, 971 F.2d 1113, 1118 (4th Cir. 1992); see also Salve Regina College v. Russell, 499 U.S. 225, 238 (1991) ("When de novo review is compelled, no form of appellate deference is acceptable."); Dawson v. Marshall, 561 F.3d 920, 933 (9th Cir. 2009) ("De novo review means that the reviewing court 'do[es] not defer to the lower court's ruling but freely consider[s] the matter anew, as if no decision had been rendered below.'") (quoting United States v. Silverman, 861 F.2d 571, 576 (9th Cir. 1988)).

In an ERISA denial-of-benefits case such as this,

de novo review generally consists of the court's independent weighing of the facts and opinions in th[e administrative] record to determine whether the claimant has met his burden of showing he is disabled within the meaning of the policy. While the court does not ignore facts in the record, the court grants no deference to administrators' opinions or conclusions based on these facts.

Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 518 (1st Cir. 2005) (citation omitted).

Thus, the question in this case is not whether Aetna's decision to terminate Barrett's long-term disability insurance was reasonable or was based on substantial evidence in the record. Indeed, the Court does not give any deference to Aetna's decision or reasoning when deciding the outcome of these Motions. Nor is evidence regarding Barrett's condition in the late 1990s or in 2010 particularly relevant to the Court's calculus. Rather, the Court must decide, based on its own view of the evidence in the

record, whether Barrett was still disabled in September 2006 when Aetna determined that he was not.

**B.    Evidence in the Administrative Record 2005-2007**

**1.    Barrett's Treating Physicians**

On September 13, 2005, Barrett had surgery to remove the morphine pump from his spine. (AE2513.) The tip of the pump had broken off in Barrett's spinal column, and the surgeon was required to dissect Barrett's back to remove the pump. (AE2514.) A month after the surgery, Dr. Orlando Charry of the University of Minnesota Medical Center Pain Management Center reported that Barrett's deep tendon reflexes were below normal range, and that he had decreased sensation to light touch and pinprick on the lateral aspect of his left leg and foot. (AE2509.) In November 2005, Dr. Charry noted that his examination of Barrett revealed not only decreased sensation in his left lower extremity, but also decreased muscle strength in his extensor hallucis longus[4] on the left side. An MRI report from November 22, 2005, showed that Barrett had "[d]egenerative disc space narrowing and signal loss with a diffuse disc bulge [and] mild posterior lateral bulging of the disc without focal disc protrusion or significant central stenosis."[5]

---

[4] The extensor hallucis longus is a muscle that extends from the fibula down the leg to the big toe and extends the big toe. Extensor hallucis longus muscle, http://en.wikipedia.org/wiki/Extensor_hallucis_longus_muscle (last visited Sept. 28, 2011).

[5] "Spinal stenosis is a narrowing of one or more areas in [the] spine . . . . This narrowing can put pressure on the spinal cord or spinal nerves at the level of compression." Spinal Stenosis Definition, http://www.mayoclinic.com/health/spinal-stenosis/DS00515 (last visited Sept. 28, 2011).

(AE2434.)  The MRI also showed that there was "[v]ery minimal foraminal narrowing."[6]

(Id.)  The chart note from Barrett's appointment at the Twin Cities Spine Center on

December 17, 2005, noted that deep palpation of Barrett's lumbar spine caused his knees

to buckle, and that Barrett's reflexes on the left side and his left calf were decreased.

(AE2494.)

On March 7, 2006, the Social Security Administration certified Barrett as having a

continuing disability under Social Security Disability Insurance rules.  (AE2488.)  At

Aetna's request, Barrett's physician, Dr. Chris Armstrong, filled out an Attending

Physician's Statement on March 8, 2006.  He noted that Barrett was scheduled for yet

another surgery on March 14, and opined that Barrett had no ability to work.  (AE2319.)

The March 14 surgery removed a screw that had been implanted in Barrett's first

spinal fusion.  The screw, at L5-S1, had "clearly penetrated inferiorly out through the

facet and was in physical contact with the exiting nerve root."  (AE2501.)  The surgeon,

Dr. Michael Madsen, removed both facet screws from Barrett's spinal column.  (Id.)  On

April 20, 2006, at his first follow-up appointment after the surgery, Dr. Joseph H. Perra of

the Twin Cities Spine Center noted that Barrett reported an improvement in the pain into

his left foot.  (AE2497.)  However, the improvement did not last, and by October, Dr.

Perra wrote that Barrett's symptoms had returned.  (AE2493.)  Dr. Perra believed that the

initial improvement in symptoms was due to the nerve paste applied during surgery.  (Id.)

---

[6]  Foraminal narrowing is the narrowing of the hole through which the nerve exits
the spine.  Foraminal Stenosis, http://www.atlanticspinalcare.com/spinehealth/conditions/
foraminal_stenosis/ (last visited Sept. 28, 2011).

His physical examination of Barrett noted weakness in Barrett's left foot.  (Id.)  Dr. Perra

concluded that "[c]hronic pain management is [Barrett's] best option."  (Id.)

In January 2007, Barrett's long-time treating physician, Dr. Douglas Rachko,

signed Barrett's application for a disabled parking sticker, certifying that Barrett was

disabled and entitled to the sticker.  (AE2484.)  In July 2007, an MRI revealed that

Barrett suffered from aseptic necrosis of both femoral heads,[7] a condition that usually

requires hip replacement surgery.  (The record shows that Barrett had his left hip replaced

in 2008.  (AE2792.))  A July 16, 2007, examination by Dr. Charles Watts of

Neurosurgical Associates, found that Barrett's straight-leg raising was positive on the left

(AE2808), and that Barrett had "abnormal reflexes in the patellar and Achilles

distribution suggestive of myelopathy."[8]  (AE 2810.)  Dr. Watts also stated that Barrett's

MRI shows that he has "significant deformity with retrolisthesis[9] of C6 on C7."  (Id.)  In

August 2007, however, Dr. Watts opined that "none of the findings on his MRI or plain

films explain his current difficulty."  (AE2811.)

_____

[7] Aseptic necrosis, also called avacular necrosis, "is a condition that results from poor blood supply to an area of bone causing bone death."  Avascular Necrosis of Femoral Head, http://www.pitt.edu/~antonp/Welcome.html (last visited Sept. 28, 2011). Femoral heads are highest part of the thigh bone.  Femur head, http://en.wikipedia.org/ wiki/Femur_head (last visited Sept. 28, 2011).

[8] Myelopathy is "any functional disturbance and/or pathological change in the spinal cord."  Myelopathy, http://medical-dictionary.thefreedictionary.com/myelopathy (last visited Sept. 28, 2011).

[9] Retrolisthesis is posterior displacement of one vertebrae with respect to adjacent vertebrae.  Retrolisthesis, http://en.wikipedia.org/wiki/Retrolisthesis (last visited Sept. 28, 2011).

In addition, the record is replete with evidence regarding the pain medication Barrett has been prescribed since his injury.  Those medications include OxyContin (oxycodone), Percocet (acetaminophen and oxycodone), Valium (diazepam), Paxil (paroxetine), Wellbutrin (buproprion), trazedone, and Ambien (zolpidem).  (AE2857-83). He continues to take large doses of OxyContin daily, along with Percocet, Valium, and Ambien.  (AE2828, AE2831.)

The record also contains treatment notes from providers of psychological counseling services, and as discussed in more detail below, Aetna considered these medical records on its review of Barrett's appeal.  However, because Barrett did not begin any treatment for his alleged psychological problems until after Aetna's initial decision to terminate his disability benefits, his current claims of psychological disability are not necessarily relevant to determining whether he was disabled at the time Aetna determined that he was not.  Absent an indication from a treating counselor or psychologist that Barrett's psychological problems originated before the September 26, 2006, termination of his benefits, the Court will not consider whether Barrett's depression and other psychological symptoms rendered him unable to work at that time.

**2.     Surveillance, Interview, and Physician Reaction**

As noted, Aetna engaged the services of a private investigator to conduct an interview with Barrett and also to perform surreptitious video surveillance of him.  The surveillance took place in late May 2006.  On May 25, 2006, Barrett is seen walking out of his home and bending to retrieve some boxes or bins, likely recycling bins, from the

curb in front of his house.  There is no further videotaped activity.  On May 26, 2006,

Barrett walks his two young daughters to school, along with two dogs.  He bends to take

one of the dogs off the leash at one point.  He appears to be wearing a back brace, and his

movements are stiff and awkward.  In particular, his gait is not fluid but is noticeably

stiff.

The majority of Barrett's videotaped activity takes place on May 27, 2006, when

he coached his daughter's soccer practice during the morning hours.  During the practice,

Barrett is observed performing a variety of physical tasks, such as: bending; carrying and

setting up soccer equipment; slowly jogging on multiple occasions; demonstrating soccer

moves, including crouching and jumping from side to side as a goalie would; and

crawling on his hands and feet.  Twice, he lifted himself onto a wall that was between 3

and 4 feet high; on the second occasion he sat on the wall for approximately 5 minutes.

He also bent to  pick up a small dog and then lifted the dog over the wall.  However, it is

clear from the tape that Barrett is wearing a back brace during the entire practice, and he

appears to frequently stretch his back, often bending or leaning against something to

stretch.  Although he occasionally moves fluidly, more frequently his movements appear

stiff. and awkward.  Moreover, he does not move much at all; certainly he does not move

around as much as a youth soccer coach generally would in such a situation.  Finally, on

several occasions the tape skips minutes at a time—at one point skipping nearly 15

minutes of time—and there is no way to know what Barrett might have been doing during

the missed time.

In August 2006, the investigator interviewed Barrett on two separate occasions. (AE2328-31 (Aug. 20, 2006, interview report submitted to Aetna).)  The investigator noted that Barrett walked with unsteadiness but did not use a cane, and that he moved and shifted his weight often during the interview.  (AE2328.)  Barrett reported to the investigator that he was "totally unable to partake in any kind of sports activity" because of his pain.  (AE2328-29.)  In his written statement to the interviewer, Barrett noted that he had "not been involved with any volunteer or other non-compensated activity since my back problems started," and claimed that he was unable to "run or jump or participate in any sports activities of any kind."  (AE2334, AE2337.)

Aetna sent the videotape to Barrett's long-time physician, Dr. Rachko, for comment.  Dr. Rachko told Aetna that, because of his own physical problems, he had not treated Barrett for more than three years, although he had seen him in May 2006 for the first time in years.  (AE2453.)  He opined that Barrett exhibited "pain-seeking" behavior and stated that Barrett appeared different in the examination room than he did in the waiting room or parking lot, when he was not being observed.  (AE2454.)  He said that he was "surprised" by the video, and concluded that he was "not comfortable supporting a recommendation of total disability" after seeing the video.  (Id.)  He qualified those remarks, however, by reminding Aetna that he was not an expert in disability determinations.  (Id.)

### 3.    Aetna's Reviewing Physicians

Four different physicians reviewed Barrett's file in the course of Aetna's initial

termination of benefits and the subsequent appeals.  None of these physicians ever examined Barrett personally.

In May 2007, Dr. Michael Goldman, D.O., reviewed Barrett's file.  (AE2695-99 (May 18, 2007, Physician Review).)  Dr. Goldman noted that, "in reviewing all of [Barrett's] medical records there are no specific examination findings at anytime [sic] that identify any specific functional impairments from returning to sedentary work." (AE2697.)  In Dr. Goldman's view, the video showed that Barrett was not "in any distress."  (Id.)  Dr. Goldman also reported speaking with Dr. Charry of the Pain Management Center.  According to Dr. Goldman, Dr. Charry said that Barrett "was able to perform sedentary work."  (AE2698.)  Dr. Goldman concluded that the record did not support Barrett's claimed functional impairments, and that Barrett was capable of performing full-time sedentary work with some lifting and movement restrictions.  (Id.)

Dr. Goldman performed a second file review in August 2007, reporting on a conversation with Barrett's physician, Dr. Perra of the Twin Cities Spine Center. (AE2690-94.)  Dr. Perra ostensibly told Dr. Goldman that Barrett had no functional impairments that would prevent him from sedentary to light activity.  (AE2693.)

Also in August, Dr. Lawrence Burstein, Ph.D., reviewed Barrett's file.  (AE2684-89.)  Dr. Burstein's speciality is psychiatry.  Dr. Burstein noted that none of the psychological treatment notes contained any measurements of Barrett's cognitive functioning that would support any claimed psychological impairment.  (AE2687-88.) Dr. Burstein reported on a conversation with Dr. Georgia Panopoulos, a psychologist

treating Barrett.  (AE2687.)  According to Dr. Burstein, Dr. Panopoulous believed that

Barrett was unable to work because he could not manage his pain.  (Id.)  She told Dr.

Burstein that she was not surprised that Barrett appeared to function well on the

surveillance video because Barrett "goes to great lengths to mask his pain from his

children."  (Id.)  Dr. Panopoulos also told Dr. Burstein that Barrett was angry at the

medical profession and at his physician.  (Id.)  Dr. Burstein concluded that Barrett's

medical records "[did] not support a finding of a functional impairment, from a

psychological perspective . . . ."  (AE2688.)

In June 2010, two additional physicians and one psychologist reviewed Barrett's

file.  The first, Dr. Lawrence Brett Babat, is an orthopaedic surgeon and a fellow in spine

surgery at the Cleveland Clinic.  (AE2914.)  His review chronicled Barrett's medical

records, discussed the previous medical reviews of the file, and noted the surveillance

tape.  (AE2903-12.) Dr. Babat recommended that a functional capacity exam ("FCE") be

performed on Barrett to obtain biometric and validity data that might provide objective

evidence of his impairment.  (AE2914.)  No such FCE was performed.[10]  Despite the

absence of an FCE with such objective data, Dr. Babat concluded that Barrett's records

did not support any functional impairment because there was no "objective data" to

support Barrett's subjective pain complaints.  (AE2913.)  In addition, Dr. Babat found

that there was no indication that Barrett had "a loss of structural integrity that preclude[s]

---

[10]  A FCE had been performed on Barrett, at his expense, in February 2010.
(AE2826.)  According to the physician reviewers, however, this FCE was not relevant
because the examiner did not collect objective validity data to support his conclusion that
Barrett was unable to work even at a sedentary position.

a sedentary level position with restrictions." (AE2914.)

The second file reviewer was Dr. Marvin Chang, a Board-certified anethesiologist and specialist in pain medicine. (AE2932.) Like Dr. Babat, Dr. Chang also reviewed Barrett's medical records. (AE2921-30.) As Barrett points out, Dr. Chang's review of the records is almost identical to Dr. Babat's review of the same records, using identical language and phrases to describe the contents of the records. Thus, Barrett alleges that whether Dr. Chang or Dr. Babat actually personally reviewed all of Barrett's voluminous medical history is an open question. The Court will not and need not resolve this controversy here. Dr. Chang highlighted the "strong somatic component" of Barrett's complaints of pain, noting that Barrett's physical examinations did not reveal any evidence of neurologic compromise or lumbar radiculopathy. (AE2931.) Dr. Chang also discussed the February 2010 FCE, noting that the utility of the FCE was questionable because the FCE did not provide any validity data to show that Barrett expended maximal effort during the exam. (Id.) As did Dr. Babat, Dr. Chang recommended that another FCE be performed that included validity data. (AE2932.) Dr. Chang concluded that "the record strongly suggests that [Barrett] could safely perform activities of work at the sedentary level with modifications." (Id.)

Finally, Dr. Elana Mendelssohn, Psy. D., examined Barrett's medical history and the administrative record. (AE2934-39.) She, too, concluded that Barrett's history did not support a finding of a functional impairment "from a psychological perspective." (AE2938-39.) She also spoke with Dr. Panopoulos, who told her that Barrett would not

be able to work because of his mental condition, which Dr. Panopoulos attributed to Barrett's inability to "let go of his disability" and the fact that he has "'taken on the sick role.'" (AE2938.)

In the course of Barrett's appeals, two of his treating physicians, Dr. Perra and Dr. Charry, responded to the reviewing physician's interpretations of or comments on, their diagnoses and statements regarding Barrett's capacity for sedentary work.  Dr. Perra wrote Barrett's attorney that Dr. Goldman misinterpreted his statements in this regard. (AE2818 (Mar. 8, 2010, letter from Dr. Joseph H. Perra to Jodell M. Galman, Esq.).) While Dr. Goldman characterized Dr. Perra's evaluation of Barrett's work capacity as finding "no functional impairment for . . . sedentary work," Dr. Perra emphasized that he instead believed there "should be no structural reason[]" why Barrett could not work at a sedentary job.  (Id.)  As Dr. Perra stated, "This is something clearly different from a functional level, which both implicates those structural issues and the issue of pain."  (Id.) Whether Barrett can work despite his pain is a "functional issue, which is distinguished from [the] structural issue" on which Dr. Perra commented.  (Id.)

Dr. Charry told Barrett's attorney that he recalled no conversation with Dr. Goldman.  (AE2817 (Jan. 18, 2010, letter from Dr. Orlando Charry to Jodell M. Galman, Esq.).)  In addition, Dr. Charry stated that, although Barrett exhibited "significant pain behavior," he believed that Barrett would "be able to rehabilitate physically and emotionally to participate in meaningful productive work activity within the limitations determined by a functional capacity evaluation.  Unfortunately this type of evaluation was

not performed."  (Id.)

## C.     Analysis

For purposes of the Court's analysis of the record, it is important to reference what Barrett claims as his physical disability.  He does not, for example, claim that he is unable to walk or to lift anything at all.  Rather, he claims that his pain prevents him from sitting or standing in one position for long periods of time, and that he can only lift lightweight items.  It is also necessary to note that credibility determinations are difficult, if not impossible, to make on a paper record.  Thus, although much of Aetna's argument implies that Barrett is exaggerating his pain, at no point in the record does any person who actually examined Barrett accuse him of lying about his pain.

There is, however, a plethora of evidence in the record that Barrett suffers from severe pain in his back.  There is objective evidence, summarized above, and subjective evidence as well, including Barrett's self reports, the reports of his family and friends (e.g., AE 2851 (Mar. 26, 2010, letter from Janet Barrett "to whom it may concern")), and the reports of his appearance to his treating physicians.  Moreover, the fact that he is continually prescribed large doses of narcotic pain medication is itself evidence that his physicians believe that he is in considerable pain.

There is also evidence that Barrett's subjective complaints may not be reasonable. Dr. Rachko's letter regarding the surveillance references Barrett's "pain-seeking" behavior and Dr. Rachko's opinion that Barrett may be exaggerating his symptoms.  Dr. Panopoulos ostensibly reported to file reviewer Dr. Mendelssohn that Barrett was

obsessed with pain and had "taken on the sick role."  Again, however, neither Dr. Rachko nor any other physician ever made a finding that Barrett was indeed lying about any of his symptoms.

The surveillance video likewise is not evidence that Barrett can perform the functions of a sedentary, full-time job.  Although a plan administrator may reasonably rely on a surveillance video in determining a claimant's entitlement to benefits, Green v. Union Sec. Ins. Co., 646 F.3d 1042, 1052 (8th Cir. 2011), the Court's decision in this matter does not turn on whether Aetna's use of the video was reasonable.  Rather, this Court must view the video for itself to determine whether the video establishes that Barrett is not disabled.  In the Court's view, it does not.  The video shows him attempting to coach soccer for two hours on one day.  See, e.g., Cross v. Metro. Life Ins. Co., 292 F. App'x 888, 892 (11th Cir. 2008) (surveillance video provided a "mere snapshot" of the claimant's daily activities).  It does not show him performing normally day in and day out, nor does it show him doing anything more than he admitted he could do.  More importantly, the video shows that Barrett is not comfortable even with the limited movement in which he engages during the practice.  It does not establish that Barrett is able to work.

Having examined the entire record, the Court finds that Barrett is disabled within the meaning of the long-term disability policy.  His back pain renders him unable to engage in the activities of any gainful employment, and as such, Aetna's decision to terminate his long-term disability benefits must be reversed.

17

**D.     Attorney's Fees and Prejudgment Interest**

Barrett's Motion for Summary Judgment contends that he is entitled to attorney's fees and costs and prejudgment interest. Aetna does not respond to this contention. Because a decision as to whether ERISA entitles Barrett to attorney's fees and prejudgment interest is one that requires more legal analysis than that presented in the papers on the instant Motions, the Court will defer ruling on this request. Barrett should re-submit the request in the form of a Motion, and the parties should work together on a concise briefing schedule for that Motion. The parties should then inform the Court of the agreed briefing schedule, and the Court will consider the Motion on the papers.

**III.     ORDER**

Barrett has established that he was disabled at the time Aetna terminated his disability benefits. Accordingly, based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendants' Motion for Summary Judgment [Doc. No. 14] is **DENIED**;

2.     Plaintiff's Motion for Summary Judgment [Doc. No. 21] is **GRANTED**; and

3.     Plaintiff's request for attorney's fees, costs, and prejudgment interest is **DEFERRED**. Plaintiff shall re-file the request as a Motion and the parties will determine a concise briefing schedule for that Motion. The Court will

consider the Motion on the papers.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  October 7, 2011                           s/Susan Richard Nelson
                                                  SUSAN RICHARD NELSON
                                                  United States District Judge